**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 22-cv-1657-WJM

(Bankruptcy Case No. 20-17836-TBM)

IN RE:

HALI MAEANN SUAZO,

      Debtor.
_____

JONATHAN P. SCHULTZ, and
OVATION LAW LLC,

      Appellants,

v.

PATRICK S. LAYNG, UNITED STATES TRUSTEE,

      Appellee.

---

## ORDER AFFIRMING DECISION OF BANKRUPTCY COURT

---

      This matter comes before the Court on a bankruptcy appeal brought by Appellants Jonathan P. Schultz ("Schultz") and Ovation Law LLC ("Ovation") (jointly, "Appellants"). The parties dispute whether the United States Bankruptcy Court for the District of Colorado abused its discretion in voiding the pre-petition and post-petition attorney's fee agreements between the Debtor, Hali Maeann Suazo, and her bankruptcy attorneys under 11 U.S.C. § 526(c)(1) upon finding that the agreements contained misrepresentations in violation of 11 U.S.C. §§ 526 and 528.

      For the reasons explained below, the Court affirms the bankruptcy court's ruling.

## I. JURISDICTION

This Court has jurisdiction to hear this appeal under 28 U.S.C. § 158(a)(1), which grants district courts jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges.  Appellants timely filed a notice of appeal under 28 U.S.C. § 158(c)(2) and Federal Rule of Bankruptcy Procedure 8002 on July 1, 2022. (ECF No. 1.)

## II. STANDARD OF REVIEW

In reviewing a bankruptcy court's decision, the district court functions as an appellate court and is authorized to affirm, reverse, modify, or remand the bankruptcy court's rulings.  28 U.S.C. § 158(a); Fed. R. Bankr. P. 8013.  As the appellate court, the district court has discretion to affirm "on any ground adequately supported by the record, so long as the parties have had a fair opportunity to address that ground." *Maldonado v. City of Altus*, 433 F.3d 1294, 1302–03 (10th Cir. 2006) (internal citation and quotation marks omitted).

"In reviewing a bankruptcy court decision we apply the same standards of review as those governing appellate review in other cases."  *In re Perma Pac. Props.*, 983 F.2d 964, 966 (10th Cir.1992) (citation omitted).  A bankruptcy court's legal conclusions are reviewed *de novo*, and factual findings are reviewed for clear error.  *In re Warren*, 512 F.3d 1241, 1248 (10th Cir. 2008).  On mixed questions of law and fact, the Court reviews *de novo* any question that primarily involves the consideration of legal principles and applies the clearly erroneous standard if the mixed question is primarily a factual inquiry.  *In re Wes Dor, Inc.*, 996 F.2d 237, 241 (10th Cir. 1993).

2

## III. STATUTORY FRAMEWORK[1]

### A.  Chapter 7

A debtor who successfully concludes a Chapter 7 case receives a discharge of all pre-petition debt, except for certain debts that are not dischargeable.  11 U.S.C. §§ 523, 727(b).  The discharged pre-petition debt includes debt incurred to an attorney retained to represent the debtor in the Chapter 7 case.  *See, e.g., Rittenhouse v. Eisen*, 404 F.3d 395, 396 (6th Cir. 2005).  Thus, if a Chapter 7 debtor agreed pre-petition to pay attorney fees but does not fully pay the fees before the filing of the bankruptcy petition, the debt for the unpaid portion of the fees is an unsecured debt that is discharged in the debtor's ensuing bankruptcy case.  *Id.*

All non-exempt property held by the debtor at the time the petition is filed becomes estate property, which the Chapter 7 trustee controls and uses to pay the debtor's creditors.  11 U.S.C. §§ 541, 704, 726.  Under 11 U.S.C. § 330, only attorneys employed by the Chapter 7 trustee with court approval under 11 U.S.C. § 327 may be paid from estate property for post-petition services.  Outside of such an approved retention by the Chapter 7 trustee, post-petition attorney fees cannot be paid using estate property.  *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 538 (2004); *Land & Cattle Co. v. Lentz & Clark, P.A.* (*In re Wagers*), 514 F.3d 1021, 1026 (10th Cir. 2007).

### B.  Statutory Restraints

In 2005, Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23.  BAPCPA was "a

---

[1] The Court takes the Statutory Framework section from the Appellee's brief.  (ECF No. 11 at 10–18.)  Appellants do not dispute these legal propositions in their reply brief.  (*See* ECF No. 12.)

comprehensive package of reform measures" designed "to improve bankruptcy law and practice by restoring personal responsibility and integrity in the bankruptcy system and ensure that the system is fair for both debtors and creditors."  H.R. Rep. No. 31, 109th Cong., 1st Sess. Pt. 1, at 2 (2005) ("House Report").  BAPCPA both modified the substantive standards for bankruptcy relief and adopted new measures intended to curb a variety of abusive practices that Congress concluded had come to pervade the bankruptcy system.

For example, Congress heard evidence that the United States Trustee Program had "consistently identified *** misconduct by attorneys and other professionals" as among the sources of abuse in the bankruptcy system.  House Report at 5 (citation omitted).  Congress responded to that evidence by "strengthening professionalism standards for attorneys and others who assist consumer debtors with their bankruptcy cases."  *Id.* at 17.

BAPCPA added or enhanced a variety of provisions governing bankruptcy professionals' conduct.  Those statutes protect consumer debtor clients and prospective clients of bankruptcy professionals, the creditors of clients who enter bankruptcy, and the bankruptcy system.  The statutes require additional disclosures to clients about their rights and the responsibilities owed them by the professionals representing them; they protect clients from false promises and against being overcharged, or charged for services never provided; and they discourage misuse of the bankruptcy system.  *See, e.g.*, 11 U.S.C. § 110(b)-(h), 11 U.S.C. §§ 526-528, 11 U.S.C. § 707(b)(4)(C)-(D).

Congress was particularly concerned by misconduct of debt relief agencies.  In this context both attorneys and law firms qualify as a "debt relief agency."  *Milavetz,*

*Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 236–38 (2009).

Section 526 mandates debt relief agencies comply with statutorily imposed standards of professional conduct, including these:

- Section 526(a)(1) requires bankruptcy attorneys to perform all promised services;

- Section 526(a)(2) prohibits bankruptcy attorneys from making an "untrue or misleading" statement in a document filed in a case; and

- Section 526(a)(3) precludes bankruptcy attorneys from misrepresenting "directly or indirectly, affirmative or by material omission" the services they will provide or the benefits and risks attendant to filing for bankruptcy.

Additionally, Section 528(a)(1) requires a debt relief agency-attorney to provide clients with a written contract within five days of first providing services but before filing a bankruptcy petition. 11 U.S.C. § 528(a)(1). That contract must explain "clearly and conspicuously" the services that the attorney will provide, the fees for those services, and the terms of payment. *Id.*

A contract for bankruptcy assistance that does not comply with these provisions is void and unenforceable. 11 U.S.C. § 526(c)(1). A bankruptcy attorney who intentionally or negligently fails to comply with these provisions is liable for fees already received, actual damages, and attorneys' fees. 11 U.S.C. § 526(c)(2). A bankruptcy attorney is equally liable for the same if the client's case was dismissed or converted because of the attorney's intentional or negligent failure to file required documents, including those required under 11 U.S.C. § 521 (requiring the debtor to file various financial schedules and statements). And if there is a clear and consistent pattern of

5

violating section 526, the court may issue an injunction or impose civil penalties.  11

U.S.C. § 526(c)(5).

**C.     District of Colorado Local Bankruptcy Rule 9010-1**

District of Colorado Local Bankruptcy Rule 9010-1 requires an attorney who files

a bankruptcy petition to represent the debtor for "all purposes."  L.B.R. 9010-1(c)(1).

Attorneys may not circumvent this requirement by limiting the services they will provide

under a client engagement letter or in the disclosures regarding attorney compensation.

*Id.*; *cf.* D.C.COLO.LAttyR 2(a) & (b)(1) (this Court's local rules adopting the Colorado

Rules of Professional Conduct, but, with a limited exception, excluding Colo. RPC

1.2(c), which permits attorneys to limit the scope of representation).

The bankruptcy court's local rule requiring this scope of duty permits the

following exceptions: (1) for adversary proceedings; (2) where filing a document would

violate the attorney's ethical duty under Fed. R. Bankr. R. 9011; or (3) where the debtor

has failed to pay the attorney's fees, at which point an attorney may move for

withdrawal, but may not do so "prior to completion of the Basic Services, as defined in

L.B.R. 9010-1(c)(5), except upon a showing of good cause."  L.B.R. 9010-1(c)(2).

Further, while a motion to withdraw is pending, the attorney must continue to perform for

the debtor all "Necessary Services" as defined by the local rules, which may not be

limited to the Basic Services.  *Id.*

The rule defines "Necessary Services" as "all services that are necessary to

represent the interests of the debtor in a particular case."  L.B.R. 9010-1(c)(4).

"Basic Services" are defined as including the following:

(A) meeting with the debtor, advising the debtor, and analyzing the needs of the

case;

6

(B) preparing a complete filing package as required by Rule 1007 and any necessary amendments thereto;

(C) attending the debtor's meeting of creditors pursuant to 11 U.S.C. § 341 and any continued meetings of the same;

(D) advising and assisting the debtor with any trustee requests for turnover and any audit requests from the United States Trustee; [and]

(E) advising the debtor regarding any reaffirmation agreements . . . .

L.B.R. 9010-1(c)(5).

The local rule specifically references as part of the "Basic Services" the filings required by Fed. R. Bankr. P. 1007.  Bankruptcy Rule 1007, as well as 11 U.S.C. § 521, require that the debtor file, among other things:

- schedules of assets and liabilities;

- a schedule of current income and expenditures;

- a schedule of executory contracts and unexpired leases;

- a statement of financial affairs; and

- a statement of current monthly income

Fed. R. Bankr. P. 1007(b)(1)&(4); 11 U.S.C. § 521(a)(1)(B).  Rule 1007 requires that these schedules and statements "shall be filed with the petition or within 14 days thereafter."

**D.    Statutory Requirements to Reaffirm a Dischargeable Debt**

Once a debt is discharged under Chapter 7, the Bankruptcy Code prohibits any legal proceedings or other acts to collect on that debt as a personal liability of the debtor.  11 U.S.C. § 524(a)(2).  A debtor's agreement to pay a discharged or

7

dischargeable debt, termed a reaffirmation agreement, must meet certain statutory requirements to be enforceable.  *See* 11 U.S.C. § 524(c) & (d).

These subsections grew out of a congressional concern about the "unequal bargaining position of debtors and creditors" and the "creditors' superior experience in bankruptcy matters" that lead to an impairment of the "fresh start goal" of bankruptcy relief.  H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6124.  When Chapter 7 attorneys do not receive full payment on their pre-petition contracts, they are creditors in the bankruptcy case, so this concern applies to them.

Among the statutory prerequisites to render enforceable a reaffirmation agreement is the requirement that the debtor receive the disclosures described in section 524(k), at or before the time the debtor signed the reaffirmation agreement.  11 U.S.C.§ 524(c)(2).  Unless the debt is secured by real property, any reaffirmation agreement by an individual who was not represented by an attorney in negotiating the agreement requires a bankruptcy court's approval upon motion.  11 U.S.C. § 524(c)(6). To approve the reaffirmation agreement, the court must determine that it does not impose an "undue hardship" and is in the "best interest of the debtor."  *Id.*

## E.      Reasonableness of Attorneys' Fees Under 11 U.S.C. § 329

Bankruptcy courts are authorized under 11 U.S.C. § 329(b) to determine whether a debtor's attorney's compensation for services in the case is reasonable and to cancel an agreement to pay compensation and order the return of compensation paid if such compensation exceeds the reasonable value of the service provided.  11 U.S.C. § 329(b).  Any party may seek a determination of the reasonableness of the fees paid or the court may do so on its own motion.  Fed. R. Bankr. P. 2017.

F.     **The United States Trustee**

The United States Trustee is an official of the Department of Justice appointed by the Attorney General to supervise the administration of bankruptcy cases.  28 U.S.C. §§ 581–89.  United States Trustees act in the public interest to promote the efficiency and to protect and preserve the integrity of the bankruptcy system.  H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6049 (providing that United States Trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty and overreaching in the bankruptcy arena").  To this end, Congress has provided that United States Trustees "may raise and appear and be heard on any issue in any case or proceeding," subject to an exception not applicable here. 11 U.S.C. § 307.  The United States Trustee also has express standing to seek relief under section 526(c)(5).

## IV. PROCEDURAL BACKGROUND[2] [3]

On December 9, 2020 ("Petition Date"), Suazo filed a petition ("Petition") for bankruptcy protection under Chapter 7 through her legal counsel, Jonathan Schultz. (Bankr. ECF No. 1; Ex. 1; Stip. Fact No. 16.)  Suazo and Schultz both signed the Petition.  (Bankr. ECF No. 1; Ex. 1; Stip. Fact No. 17.)  Schultz executed the Petition, noting his relationship with the Arizona-based law firm, Ovation.  (Bankr. ECF No. 1; Ex. 1.)

---

[2] The Procedural Background section contains undisputed facts and is taken from *In re Suazo*, 642 B.R. 838, 842–43 (Bankr. D. Colo. 2022) (also referred to in this Order as the "Bankruptcy Court Order").

[3] The Appellee's Appendix, Volume I contains the parties' Joint Statement Regarding Stipulations of Facts and Exhibits from the bankruptcy court's record.  (ECF No. 11-1 at 41–54.) Such stipulated facts will be cited as "Stip. Fact No. __."

"A___" refers to the appendix of the United States Trustee and the page number of the appendix, listed on the bottom right corner of the page.  (ECF Nos. 11-1, 11-2.)  "Bankr. ECF No. __" refers to the docket in *In re Suazo*, Case No. 20-17836 (Bankr. Colo.).

Contemporaneously with the commencement of the bankruptcy case, Schultz submitted a "Disclosure of Compensation of Attorney for Debtor" ("Initial Compensation Disclosure"), wherein he disclosed that Suazo had not paid anything before the Petition Date but agreed to later pay him (not Ovation) $2,998.  (Bankr. ECF No. 8; Ex. 2; Stip. Fact No. 21.)  The United States Trustee appointed Simon E. Rodriguez as the Chapter 7 Trustee ("Trustee" or "Appellee") for Suazo's bankruptcy estate.  (Bankr. ECF No. 7; Stip. Fact No. 19.)

The initial bankruptcy filing was a "bare-bones" or "skeletal" submission which did not include many documents required by Section 521.  Accordingly, on December 10, 2020, the bankruptcy court issued a "Notice of Deficiency" requiring Suazo to file various documents by December 23, 2020.  (Bankr. ECF No. 9; Stip. Fact No. 22.) Thereafter, Schultz drafted the missing "Statement of Financial Affairs," "Summary of Assets and Liabilities," "Schedules," "Chapter 7 Statement of Current Monthly Income," and "Chapter 7 Means Test Exemption."  Suazo signed the foregoing documents on December 13, 2020.  (Bankr. ECF Nos. 12–22; Ex. 3; Stip. Fact Nos. 23–27.)  A few days later, on December 15, 2020, Schultz filed all such documents with the bankruptcy court.  (*Id.*)

Over the next few months, Suazo made a few minor changes.  On her behalf, Schultz filed an "Amended Statement of Intention for Individuals Filing Under Chapter 7," "Amended Schedule D," and "Amended Schedule E/F," a "Notice of Amendment," and a "Financial Management Course Certificate."  (Bankr. ECF No. 23–26, 29; Ex. 4; Stip. Fact Nos. 28–31.)  Suazo received her Chapter 7 "Discharge Order" on March 15, 2021.  (Bankr. ECF No. 30.)  The entry of a discharge effectively ended Schultz's work

for Suazo.

Several months later, on April 22, 2021, the Trustee filed the Motion to Examine. (Bankr. ECF No. 33.)  The Motion to Examine seemingly prompted Schultz to submit an "Amended Disclosure of Compensation of Attorney for Debtor."  (Bankr. ECF No. 41; Ex. 5; Stip. Fact No. 33.)  Schultz and Ovation also filed their Objection to the Motion to Examine.  (Bankr. ECF No. 40.)

The bankruptcy court conducted a preliminary hearing on the Motion to Examine and Objection, during which the Trustee, Schultz, and Ovation requested a full evidentiary hearing.  The bankruptcy court concurred and set a trial, along with various associated deadlines.  (Bankr. ECF No. 45.)  Prior to the evidentiary hearing, the Trustee, Schultz, and Ovation submitted a "Joint Statement Regarding Stipulations of Fact and Exhibits" pursuant to which the parties agreed to certain stipulated facts and the admissibility of certain documents.  (Bankr. ECF No. 59.)

On December 8, 2021, the bankruptcy court conducted a trial on the Motion to Examine and Objection.

## V. FACTUAL BACKGROUND[4]

### A.    Schultz and Ovation Law

Schultz is an attorney licensed to practice in Colorado since 2008.  (A42 (¶ 54);

---

[4] For the following reasons, the Court takes the Background section from Appellee's Statement of Facts (ECF No. 11 at 18–38) and the Bankruptcy Order, *In re Suazo,* 642 B.R. at 842.  According to Appellants, this "appeal involves a mixed question of law and fact largely deriving from uncontested facts," and "the underlying facts concerning Appellants' engagement by the debtor were largely undisputed."  (ECF No. 10 at 5; ECF No. 11 at 18–38.)  Because Appellants did not include a fulsome statement of facts in their briefs, the Court utilizes Appellee's facts section and the Bankruptcy Order.  To the extent any disputed facts exist, the Court addresses them.

A311 (Tr. 83:9-13).)  He represents consumer debtors in their bankruptcy cases.  (A42 (¶ 52).)

While Schultz owns and operates his own law firm, (A41 (¶ 52)), he is also a "partner" of Ovation Law, which is based in Phoenix, Arizona (A41-42 (¶¶ 44, 49)). Ovation recruits attorneys in "various markets" to become Ovation "partners," who then provide consumer bankruptcy legal services to Ovation's clients in the attorneys' local markets.  (A166.)  Under their partnership agreement, Schultz obtained no equity interest in Ovation, has no right to participate in Ovation's management, and may retain his own practice separate from Ovation.  (A166.)  In exchange for "providing all legal services to clients originated by" Ovation, Schultz was compensated one-third of the legal fees paid by Ovation's clients, less any filing fees, credit report fees, or third-party financing fees.  (A166, 168; A42 (¶ 55).)

## B.   Ovation's Bifurcated Fee Structure

If a Chapter 7 debtor agrees pre-petition to pay attorney fees but does not fully pay those fees before the filing of the bankruptcy petition, the debt for the unpaid fees is discharged as an unsecured claim in the debtor's bankruptcy.  *See Rittenhouse*, 404 F.3d at 396.  For Chapter 7 cases, as an alternative to either (i) requiring clients to pay the attorney's fee in full prior to filing a bankruptcy petition, or (ii) running the risk of having unpaid fees be discharged, Ovation developed a bifurcated fee structure. (A182.)

For bifurcated fee cases, Ovation prepares a "skeleton" filing "with the minimum, required documents to commence a Chapter 7 case under Fed. R. Bankr. P. 1007(b) (together with any local rule requirements)."  (A182.)  Once the bankruptcy petition is filed, the Ovation partner prepares and files "all post-petition documents, including all

statements and schedules within fourteen (14) days from the initial filing of the case."
(A182.)

For clients who pay the attorney's fee in full prior to filing the bankruptcy petition, Ovation charges $1,960, including the $338 filing fee, credit report fee ($37 if single and $74 if married), $18.99 credit counseling fee, and $12.99 debtor education class. (A189.)

However, if a client chooses the bifurcated fee option, Ovation's pre-petition agreement ("Pre-Filing Agreement") states that it charges nothing for its pre-petition services and that it pays on the client's behalf the cost of the necessary credit reports and credit counseling class, waiving its right to repayment of those costs and fees. (A113–34, 190.)  Although the Pre-Filing Agreement does not state that Ovation will pay for the client's filing fee, under Ovation's policies, its partners are directed to "use [Ovation's] bank account to pay the applicable filing fee."  (A184, 190.)

Then, under Ovation's post-petition agreement ("Post-Filing Agreement"), clients are charged $2,998, which includes the $338 filing fee and cost of the debtor education class.  (A135–48, 190.)  Clients are put on a payment plan for a period of 12 months to complete payment of their attorneys' fees.  (A191.)

Ovation justifies the higher price for its bifurcated fee in part by pointing to the financing cost charged by Fresh Start Funding ("Fresh Start" or "FSF").  (A192.)  Fresh Start provides Ovation a line of credit on which Ovation get an advance of 75% of fees due under post-petition fee agreements approved by Fresh Start, 10% of which is held back as security for the owed fees.  (A161 (¶¶ 2 & 2.2); A43-44 (¶ 64).)  Fresh Start extends this line of credit in exchange for a lien on Ovation's account receivables and,

under Ovation's post-petition fee agreement, the lawyer has the debtor-client authorize

Fresh Start to collect directly the outstanding fees owed by the client.  (A162 (¶ 5.4);

A191; A43–44 (¶ 64).)  As a fee for its services, Fresh Start retains "25% of the fees

and costs" that Ovation charges the lawyer's client under the Post-Filing Agreement.

(A192.)

Some of the owners of Ovation are also owners of Fresh Start and thus receive

financial benefits from Fresh Start's financing of the attorneys' fees for Ovation's clients.

(A193.)  By signing their Post-Filing Agreements, clients "acknowledge" that they

"understand this [written] explanation and give [their] informed consent to waive this

potential conflict [of interest]."  (A193.)  Similarly, by signing the Post-Filing Agreement,

clients are deemed to understand and waive various other potential conflicts inherent in

the parties' bifurcated fee system that is financed by Fresh Start.  (A192–93.)

In addition to Ovation's relationship to Fresh Start, Schultz has, through his own

law firm, a financing agreement directly with Fresh Start.  (A43 (¶ 63).)  He has, through

Ovation or through his own firm, entered into bifurcated fee agreements financed by

Fresh Start with at least 10 clients other than Suazo.  (A45 (¶¶ 74–76).)

C.     **The Pre-Filing Agreement and Related Services**

1.     <u>Section 1</u>

Section 1 of the Pre-Filing Agreement groups "The Work Involved in a Chapter 7

Case" into three categories: "Pre-Filing Services," "Post-Filing Services," and

"Supplemental Post-Filing Services."  (A113.)  It also lists certain "Excluded Services."

(A114.)  In the Pre-Filing Agreement, Suazo chose a bifurcated fee arrangement

described in the agreement as "File Now Pay Later."  (A115.)

The Pre-Filing Agreement purports to create a separation between "Pre-Filing

Services" and "Post-Filing Services."  The Pre-Filing Agreement identifies "Pre-Filing Services" as: meeting and consulting with the debtor as needed prior to the case; analyzing the information from the intake questionnaire and other documents; providing due diligence, legal analysis and legal advice; and preparing and filing the petition, statement about social security numbers, and a list of creditors, and filing pre-petition counseling certificates.  (A113.)

The Pre-Filing Agreement describes the "Post-Filing Services" as: preparing and filing the debtor's statement of financial affairs and schedules; preparing and filing the means test calculations and disclosures; conducting a second signing appointment to review and sign the statements and schedules; preparing for and attending the Section 341 meeting of creditors; administrating and monitoring the case and communicating with the debtor throughout the process; forwarding the Trustee questionnaire and debtor documents to the Trustee; noticing the debtor's employer to stop any garnishments; reviewing and responding to Trustee requests; reviewing and advising the debtor regarding any motions for stay relief; reviewing and advising the debtor regarding any reaffirmation agreements or redemptions; reviewing and advising the debtor regarding any creditor violations; and any legal service required by the local rules.  (A113.)

2.    <u>Section 2</u>

Section 2 of the Pre-Filing Agreement is entitled: "Your Options to Pay Our Attorney Fee and Costs."  (A114.)  The paragraph immediately under that heading states:

> The Law Firm offers two options for you to pay the attorney fees and costs for your Chapter 7 bankruptcy. You can either "***Pay Before You File***" or "***File Now Pay Later***."  The costs and other terms of each Option are discussed below, and you must choose one of these two Options that is best for

you by writing your initials in the box next to your selection.
We will be pleased to represent you under either of these
options.

(A114 (emphasis in original).)  The Pre-Filing Agreement explains the payment options:

☐ **Option #1 – *Pay Before You File***

Under this *Pay Before You File* option, you will only sign this one agreement, and the Law Firm will provide both the Pre-Filing Services and the Post-Filing Services listed above. Our attorney fee for filing and handling your chapter 7 bankruptcy will be $2,343.00 which includes the $335 court filing fee, credit report fee ($38 if single and $76 if married), $18.99 Credit Counseling Class and $12.99 Debtor Education Class.

This *Pay Before You File* option is less expensive to you, <u>but</u>:

(1) *you are required to pay the full amount of attorney fees and costs before your case is filed,*

(2) if you require any of the Supplemental Post-Filing Services described above *you will be required to pay additional legal fees* based on our hourly rates of **$350/hour** for attorney time and **$150/hour** for paralegal time, and

(3) the Law Firm may provide some of the Post-Filing Services before the case is filed.

> **Option #2 – *File Now Pay Later***
>
> *This File Now Pay Later option is more expensive to you, but will include more legal services and allow you to pay some of the costs and our attorney fee in installments over twelve (12) months after we file your case.* Under the *File Now Pay Later* option, we will split our work for you into two separate agreements in order to offer you the ability to pay after your case is filed. You may review the second agreement before you sign this agreement.
>
> Under this Pre-Filing Agreement, we will **only provide the Pre-Filing Services listed above.** Our fee for the Pre-Filing Services will be **$0.00** and we will pay the cost of the credit reports and the 1st required class. We will waive those costs and our fees for the Pre-Filing Services so you will never have to pay for them. *The Pre-Filing Services are not all of the tasks that must be completed to successfully complete your chapter 7 case.*
>
> After your case is filed, you will have three choices to complete your case:
>
> - You can represent yourself in your bankruptcy case (called "proceeding *pro se*");
> - You can hire another attorney to represent you in your bankruptcy case; or,
> - *Within ten (10) days after your case is filed*, you can enter into a **Post-Filing Agreement** with us.
>
> If you choose to represent yourself or to hire another attorney to represent you (either of which are completely up to you) you will not owe us anything additional. We will ask the bankruptcy court to allow us to withdraw as your lawyer in accordance with the bankruptcy rules, but we will continue to represent you in the case and perform all necessary services until and unless the bankruptcy court allows us to withdraw.
>
> If you choose to enter into a **Post-Filing Agreement** with us, we will provide you with the Post-Filing Services AND the Supplemental Post-Filing Services listed above, and our fee for these services will be $2,998.  You will be able to pay this fee over a period of twelve (12) months after we file your case. This fee includes the $335 filing fee and the cost of the Financial Management class, and we will not charge you additional fees for the Supplemental Post-Filing Services if they are needed in your case.

3.      Section 3

Section 3 of the Pre-Filing Agreement, entitled "Information about the Lender the Law Firm Uses So It Can Offer the File Now Pay Later Option," provides general information about Fresh Start and explains why Ovation charges a higher fee for the File Now Pay Later option.  (A116.)

Relevant here, section 3(E) of the Pre-Filing Agreement states that "[t]he statements and schedules that are filed with the court on your behalf may show that your expenses exceed your income.  You nonetheless believe that the File Now Pay Later option is the best choice for you and you believe that you can make the required payment to FSF."  (A117.)

4.    <u>Section 4</u>

Section 4 of the Pre-Filing Agreement is entitled "Important Information about Conflicts of Interest" and explains that "[a] conflict of interest is a situation where the Law Firm's interest and your interest are, or could be, in conflict.  There are a number of actual or potential conflicts of interest that we need to disclose to you."  (A117.)  The Pre-Filing Agreement delineates seven such conflicts, some of which are reproduced below:

> A. Pursuant to the Rules of Professional Conduct, the Law Firm cannot act as your counsel to help you decide whether to enter into this agreement.  Nonetheless, we can explain this agreement to you and by signing this agreement you agree that we fully explained the terms of this agreement to you and answered any questions you had regarding the matters described in this agreement.
>
> B. There is an inherent conflict whenever attorneys represent debtors in bankruptcy for a fee.  We are working to alleviate your financial issues, while at the same time charging a fee for our services.  By signing this agreement, you acknowledge that you understand this explanation and give your informed consent to waive this conflict.
>
> C. *The Law Firm is filing your case hoping that you will sign a Post-Filing Agreement, and this may create a conflict of interest between you and the Law Firm since executing the Post-Filing Agreement will obligate you to make post-filing payments that will not be discharged in your bankruptcy.  By signing this agreement, you acknowledge that you understand this explanation and give your informed consent to waive this conflict.*
>
> D. As described above, if you choose the File Now Pay Later option and enter into a Post-Filing Agreement, the Law Firm will borrow funds from FSF based on the amount you owe the Law Firm.  This may place the Law Firm in conflict with you since the Law Firm expects to receive payments from you in order to repay FSF, and the Law Firm wishes to maintain its business relationship with FSF.  By signing this agreement, you acknowledge that you understand this explanation and give you informed consent to waive this

18

potential conflict.  In addition, some owners of the Firm are also owners of FSF and will receive financial benefits from the loan made by FSF to the Firm . . . .

. . .

F. *If you choose the File Now Pay Later option but choose not to sign a Post-Filing Agreement, the Law Firm may file a motion to withdraw from your case, which may create a conflict of interest if you do not want the Law Firm to withdraw.*  By signing this agreement, you acknowledge that you understand this explanation and give your informed consent to waive this potential conflict.

(A117–18 (emphasis added).)

     5.    <u>Section 5</u>

In Section 5, the Pre-Filing Agreement sets forth the client's obligations to the law firm, the bankruptcy court, and the Trustee.  (A118–19.)

     6.    <u>Section 6</u>

Section 6 contains numerous "Additional Important Terms," one of which is particularly relevant here:

By signing below, you acknowledge that the Law Firm has expressed that it is ready, willing and able to represent you for your entire Chapter 7 case, even *if you choose the File Now Pay Later option, which will require you to sign a Post-Filing Agreement.  If you choose the File Now Pay Later option, you further represent that you are not doing this with the intention of having the Law Firm simply file your case and then withdraw, but instead to facilitate you making payments over time for your attorney fee so that you can have an attorney represent you through the entire Chapter 7 process*.

(A119 (emphasis added).)

**D.**    **Post-Filing Agreement and Related Services**

The preamble of the Post-Filing Agreement states: "By signing this agreement, you are hiring Ovation . . . to continue to represent you in your Chapter 7 bankruptcy.

This agreement describes the legal services we will provide to you, the financial terms, and other terms of our relationship."  (A135.)  In the Post-Filing Agreement, Ovation listed 21 categories of legal services it "agree[d] to provide" after the Post-Filing Agreement.  The list mirrors the "Post-Filing Services" identified in the Pre-Filing Agreement.

### E.    Suazo's Engagement of Ovation and Schultz

Before the filing of her bankruptcy case, Suazo had been employed for a year as a veterinary technician.  (A66, 94.)  The Trustee states that in 2020, her earnings dropped from $22,874 in 2018 and $24,825 in 2019 to $8,691 in 2020.  (A66–67.)  Her monthly income less payroll deductions was $2,241.49, while her monthly expenses were $2,350, leading to a monthly deficit of $108.51.  (A95, 97.)

The Trustee estimates that the total amount of debt that Suazo could have discharged through bankruptcy relief was likely around $5,487.  She had $8,035 in assets and $50,124 in liabilities.  (A73.)  Of those liabilities, $37,987 was student loan debt that is generally non-dischargeable under the Bankruptcy Code.  (A74; 11 U.S.C. § 523(a)(8).)  Additionally, $7,762 was secured debt owed to her auto lender for a car valued at $6,650.  (A75.)  Under the Bankruptcy Code, the difference between Suazo's $7,762 secured auto loan and the car's $6,650 value became the lender's $1,112 unsecured deficiency claim.  *See* 11 U.S.C. § 506(a)(1); (A82.)  Suazo later surrendered her vehicle through her bankruptcy case.  (A108; A155.)

In seeking financial relief, Suazo found Ovation through an internet search and entered her information on Ovation's website portal.  (A41–42 (¶¶ 40, 45).)  Suazo signed Ovation's Pre-Filing Agreement on November 30, 2020, which required no payment of attorney's fees; she did so before ever conferring with Schultz or another

attorney.  (A42 (¶¶ 57–58).)  She elected the "File Now Pay Later" option, under which she committed to pay nothing for Pre-Filing Services unless she entered into a Pos-Filing Agreement.  Under the Post-Filing Agreement, she would be required to pay $2,998 in attorneys' fees and costs (including the $335 filing fee) payable over one year in 26 equal bi-weekly installments.

On referral from Ovation, Schultz represented Suazo in her bankruptcy case.  (A42 (¶ 53).)  Yet it was not until December 4, 2020, four days after Suazo signed Ovation's Pre-Filing Agreement, that Ovation contacted Schultz with a summary of Suazo's initial contact.  (A42 (¶ 47).)  Schultz contacted Suazo on the same day.  (A42 (¶ 48).)  Despite not having spoken with Suazo until December 4, 2020, Schultz e-signed the Pre-Filing Agreement with Suazo on December 1, 2020.  (A130.)  The bankruptcy court received no evidence that Ovation ever "fully explained" the terms of the Pre-Filing Agreement to Suazo.  *In re Suazo*, 642 B.R. at 851.

According to Schultz, he advised Suazo that her student loans would not be discharged through bankruptcy.  (A318 (Tr. 89:2–6).)  However, Suazo could not explain what would happen to her student loans if she filed for bankruptcy relief, calling into question Schultz's purported communications with Suazo regarding her student loans.  (A158 (Tr. 9:9–10:23).)  Regardless, despite the cost of the attorney's fee ($2,998) relative to the amount of her likely dischargeable debt ($5,487), Suazo proceeded with filing a Chapter 7 case.

After Suazo and Schultz signed the Pre-Filing Agreement, on December 9, 2020, Suazo signed and Schultz filed the "bare-bones" submission to the bankruptcy court, including: the Petition; the Initial Compensation Disclosure; a Statement of Social

Security Number; and Statement of Intention for Individuals Filing Under Chapter 7. Schultz paid the filing fee using Ovation's funds when he filed the Petition.  He also executed the Petition and the Initial Compensation Disclosure, which incorrectly stated that Suazo and Schultz entered into two, separate fee agreements for pre- and post-petition work; however, Suazo had not yet signed a Post-Filing Agreement.  It also failed to mention Ovation.

The bankruptcy court observed that Schultz's initial bankruptcy filing was a "skeletal" submission missing many documents required by Section 521 and Federal Rule of Bankruptcy Procedure 1007(b).  *In re Suazo*, 642 B.R. at 853.  Therefore, Schultz prepared the remaining required materials, filing all of the documents by December 15, 2020.  *Id.*  By that date, Schultz had completed "the lion's share" of the work in Suazo's case.  *Id.*

On December 16, 2020, Suazo signed Ovation's Post-Filing Agreement, for which she agreed to pay $2,998 in 12 monthly installments of $249.83.  (A43 (¶¶ 60–61), A136.)  Had she chosen to pay in full before filing a bankruptcy petition, Ovation would have charged her $1,938.  (A43 (¶ 59).)  Schultz signed the Post-Filing Agreement the next day.

After the Post-Filing Agreement was signed, Schultz performed only a few additional bankruptcy services for Suazo, such as representing her in a Section 341 meeting with the Trustee and aiding her in surrendering her vehicle.  (A99–109, 150–60.)

Several months after Suazo already had obtained a bankruptcy discharge and after the Trustee filed the Motion to Examine, Ovation and Schultz also submitted an

"Amended Disclosure of Compensation of Attorney for Debtor" (the "Amended Compensation Disclosure").  Schultz signed the Amended Compensation Disclosure and referenced Ovation; Suazo did not sign this document.

**F.      Suazo's Payments to Ovation**

After she signed Ovation's Post-Filing Agreement, Suazo paid only four installments of $249.83 each, for a total of $999.32.  (A149.)  She defaulted thereafter and owes Ovation the remaining attorney's fee in the amount of $1,998.67.  Additionally she is precluded from seeking a discharge of debts under Chapter 7 for another eight years.  11 U.S.C. § 727(a)(8).

## VI. BANKRUPTCY COURT'S ORDER

Following the trial, the bankruptcy court granted in part the Trustee's Motion. The court concluded that the Pre-Filing Agreement and the Post-Filing Agreements contained misrepresentations and were misleading due to—among other things—their failure to accurately disclose counsel's obligations under the Bankruptcy Code and Local Rules.  *In re Suazo*, 642 B.R. at 842.  The bankruptcy court found that on "a very fundamental level, Ovation and Mr. Schultz have attempted to improperly bifurcate and limit their legal services in a fashion contrary to the Bankruptcy Code and L.B.R. 9010-1(c) without adequate disclosure."  *Id.* at 863.  Thus, the bankruptcy court ruled that the Pre-Petition Agreement and Post-Petition Agreement were void under Section 526.  *Id.* at 842.  In addition, the bankruptcy court enjoined Schultz and Ovation from making any of the misrepresentations or misleading statements identified in the order in future Pre-Petition Agreements and Post-Petition Agreements in the District of Colorado.  *Id.* at 871.

# VII. ANALYSIS

Appellants raise four arguments on appeal, discussed below.

## A.   Illusory Fee Agreements

Appellants argue that the bankruptcy court erred by holding that the bifurcated engagement agreements Appellants offered Suazo violated the Local Rule and Section 526.  (ECF No. 10 at 7.)  They contend that they fully complied with the Local Rule, and go further by arguing that the Bankruptcy Order "completely disregards that Appellants *did* inform Ms. Suazo in the Pre-Filing Agreement, under the 'File Now Pay Later' explanation, that even if she chose not to engage Appellants post-petition and Appellants sought to withdraw, *they would continue to represent her to every extent necessary to fully comply with the Local Rule.*"  (*Id.* at 7–8 (emphasis in original).)

Additionally, Appellants highlight that Suazo was not obligated to pay the post-petition fee until she signed the Post-Filing Agreement, which was reiterated in the Pre-Filing Agreement.  (*Id.* at 9.)  They complain that the bankruptcy court's conclusions make bifurcation "practically impossible, even if not technically impermissible."  (*Id.*)  "How is bifurcation to work if pre-petition disclosures are deemed the one and only final agreement, and if a debtor cannot express a good-faith, prepetition preference without invalidating a later Post-Filing Agreement as illusory?" ask Appellants.  They make additional arguments on this issue, which the Court will not repeat in full here.  (*See id.* at 9–13.)

The bankruptcy court found that Schultz and Ovation violated Sections 526(a)(3) and 528(a)(1).  Section 526(a)(3) precludes bankruptcy attorneys from misrepresenting "directly or indirectly, affirmative or by material omission" the services they will provide or the benefits and risks attendant to filing for bankruptcy relief.  Section 528(a)(1)

requires a bankruptcy attorney to provide a client with a written contract that "explains clearly and conspicuously" the services that the attorney will provide, the fees or charges for those services, and the terms of payment.

On *de novo* review, the Court agrees with the bankruptcy court's conclusion that the bifurcated fee structure in this case is illusory.  The Bankruptcy Order recounts in painstaking detail the numerous ways in which the Pre-Filing Agreement and Post-Filing Agreement are misleading, which thus constitute prohibited misrepresentations in violation of Section 526(a)(3).  *In re Suazo*, 642 B.R. at 863–68.  While the Court will not repeat all of the ways these agreements mislead debtors, it will discuss a few it sees as particularly noteworthy.

The Pre-Filing Agreement purportedly requires Ovation and Schultz to prepare only a "skeletal" submission but not the numerous other filings Suazo would require under Section 521(a)(1)(B) and Bankruptcy Rule 1007(b) and (c).  The bankruptcy court's local rules preclude an attorney from moving to withdraw from representing a client before completing the Basic Services absent a court order to the contrary.  L.B.R. 9010-(c)(5).  This is so even when the client fails to pay the attorney's fees; in such case, the attorney must still show "good cause" to ask for leave to withdraw.  L.B.R. 9010-1(c)(2)(C)(1).  Presumably, then, the failure to pay the fees itself cannot constitute "good cause" to seek leave to withdraw.

Yet, the Pre-Filing Agreement states that if the client fails to sign the Post-Filing Agreement and agree to pay the attendant fees, then the attorney will seek leave to withdraw prior to completion of the Basic Services.  (A115.)  The Agreement states this without also disclosing the prohibition to do so under the local rule.  (A115.)

Appellants make much of the fact that in the Bankruptcy Order, the bankruptcy court does not explicitly discuss the fact that the Pre-Filing Agreement provides that if the debtor later chooses to proceed *pro se* or hire another attorney, the attorney will "continue to represent [the client] . . . until and unless the bankruptcy court allows [the attorney] to withdraw."  (ECF No. 10 at 8; A115.)  But, as Appellee argues, "that representation rings hollow without the accompanying disclosure that the bankruptcy court would not permit such motion for withdrawal even if the client fails to pay any fees, absent identified "good cause" under L.B.R. 9010-1(c)(5)."  (ECF No. 11 at 41.) Consistent with the bankruptcy court, the Court finds that this critical failure to disclose is a "material omission" for purposes of section 526(a)(3).

Next, Appellants argue that Suazo was never obligated to pay the post-petition filing fee until she signed the Post-Filing Agreement.  (ECF No. 10 at 9.)  They posit that it "seems the Bankruptcy Court deemed the bifurcation illusory *because* the disclosures were open, detailed, and robust."  (*Id.* (emphasis in original).)

Again, Appellants' arguments miss the mark.  As Appellee points out, the Pre-Filing Agreement required Suazo to represent that "[i]f [she] choose[s] the File Now Pay Later option, [she] further represent[s] that [she is] not doing this with the intention of having the Law Firm simply file [her] case and then withdraw, but instead to facilitate [her] making payments over time for [her] attorney fee so that [she] can have an attorney represent [her] through the entire chapter 7 process."   (ECF No. 11 at 42 (citing A119).)  This required representation is not an optional box to check or not check under the pre-petition agreement.  (*Id.* (citing A119).)  The client may not enter the File Now Pay Later option *unless* she also makes a legal representation that she intends to

sign the Post-Filing Agreement.  In such case, pursuing any "option" to proceed pro se or hire another attorney after the petition was filed would be contrary to that representation.  For these and all of the reasons explained in the Bankruptcy Order, the Court agrees with the bankruptcy court that such an arrangement renders any purported bifurcation illusory and affirms the bankruptcy court.

**B.      Bankruptcy Filing Fee**

In the second issue raised on appeal, Appellants argue that Section 526 does not address whether an attorney can advance the filing fee when filing a petition.  (ECF No. 10 at 16.)  They argue that the obligation in the Post-Filing Agreement is Suazo's "obligation to reimburse the attorney, and when (if at all) that obligation arises."  (*Id.*) Appellants reiterate the terms of the File Now, Pay Later option in the Pre-Filing Agreement, arguing that the terms are "clear and specific" and "expressly inform[]" Suazo that if she signs a Post-Filing Agreement, only then will she have to pay Appellants a fee, including the filing fee.  (*Id.* at 18.)  However, Appellants emphasize, the Pre-Filing Agreement also advised Suazo that after her case is filed—which will only happen if her attorney advances the filing fee—if she chose to represent herself or hire another attorney, she would not owe anything additional.  *Id.*  Appellants criticize the bankruptcy court's purported error in holding that Appellants misled Suazo because they did not advise her regarding reaffirmation of the post-petition reimbursement obligation under Section 524(c).

In analyzing the reasons for which the Post-Filing Agreement is misleading, the bankruptcy court observed a "problem" with the bankruptcy filing fee.  *In re Suazo*, 642 at 866–67.  Ovation advanced and paid the $338 filing fee to file the Petition and initiate Suazo's bankruptcy case.  However, the bankruptcy court noted that "[m]any

bankruptcy courts have determined that attorneys are not permitted to advance filing fees for bankruptcy debtors in the expectation of repayment since such conduct violates Section 526(a)(4)." *Id.* (citing *In re Brown*, 631 B.R. 77, 102–03 (Bankr. S.D. Fla. 2021) ("a law firm's payment of the filing fee with post-petition repayment by the debtor violates the Bankruptcy Code . . . "); *In re Baldwin*, 640 B.R. 104, 115 (Bankr. W.D. Ky. 2021) ("Advancement of the filing fee by an attorney, with the expectation of repayment post-petition, violates the Bankruptcy Code . . . .")).

The bankruptcy court concluded that the Pre-Petition Agreement "suggests that [Suazo] had no obligation for repayment." *Id.* at 867. But in the Initial Compensation Disclosure, Schultz and Suazo agreed to the opposite because Suazo agreed to pay $2,998, which includes the $338 filing fee. According to the bankruptcy court, this "contradictory evidence further demonstrates the illusory nature of the two-contract model." *Id.* If Suazo had no obligation to repay the filing fee, then the Post-Petition Agreement was surely misleading because it failed to disclose to Suazo that Ovation had already paid the filing fee, resulting in her having no obligation to commit to paying the already-paid fee. *Id.*

Reviewing the issues surrounding the filing fee *de novo*, the Court affirms the conclusions of the bankruptcy court. The bankruptcy court held that the retainer agreements violated Section 526 by failing to disclose material information about the filing fee regardless of when Suazo agreed to pay it. The Trustee clearly encapsulates the issue in its brief: "even if the legal obligation to repay the filing fee arose only in the post-petition agreement as appellants contend, a pre-petition commitment to enter a post-petition agreement would be the functional equivalent of a pre-petition commitment

to pay the filing fee."  (ECF No. 11 at 51 n.17.)  The Pre-Filing Agreement represents that the fees Suazo will pay under the Post-Filing Agreement will include the cost of the filing fee.  (A115.)  And the Post-Filing Agreement does not disclose the prior payment of the filing fee or indicate that the filing fee will be repaid to Ovation.  Instead, the Post-Filing Agreement provides that Suazo agrees to pay $2,650 for legal services, plus the filing fee and a class, for a total of $2,998.  (A136.)

Any obligation to repay an attorney post-petition for a filing fee paid in advance is a pre-petition obligation that is dischargeable.  (ECF No. 11 at 45 (citing *In re Baldwin*, 640 B.R. at 116).)  If Suazo agreed in her Pre-Filing Agreement to later pay the filing fees, then the agreement failed to explain that this agreement was a dischargeable obligation, and further failed to comply with the requirements to reaffirm a dischargeable debt under Section 524(c).  As the Trustee states, this would constitute a material omission under Section 526(a)(3).  (ECF No. 11 at 45.)

However, if Suazo agreed in her Post-Filing Agreement to pay the filing fee—as Appellants argue—then the Court agrees with the bankruptcy court's conclusion that such an agreement failed to disclose that Ovation and Schultz already paid the filing fee without any commitment on Suazo's part to repay it.  *In re Suazo*, 642 B.R. at 867. Additionally, the Court agrees with the Trustee's final point on this issue—the ambiguity throughout both the Pre-Filing and Post-Filing Agreements as to when Suazo committed to pay the filing fee violates the attorney's duty to make "clearly and conspicuously" the terms of payment under Section 529(a)(1).  (ECF No. 11 at 46.)  As a result, the Court affirms the bankruptcy court's findings with respect to the misrepresentations in Appellants' engagement agreements concerning the payment (and repayment) of the

bankruptcy filing fee.

## C.    Policy Arguments

Appellants cavalierly argue that the bankruptcy court "shrugged off" their policy arguments by holding that they have no role in this case.  (ECF No. 10 at 21.)  They encourage the Court to take policy considerations into account where "bifurcation is a relatively new, and to struggling clients an immensely valuable engagement structure not specifically addressed in the Bankruptcy Code."  (*Id.*)  Specifically, they assert that some of the "compelling" policy purposes supporting bifurcation include, but are not limited to: debtors receive representation rather than proceeding *pro se*, which increases debtors' chances of achieving discharge (*id.* at 22); layaway plans are not a good solution because it prolongs debtors' financial distress and puts them in the position of mustering cash to pay a lawyer while creditors continue to demand payment (*id.* at 23); and attorneys are more likely to practice bankruptcy law with a more realistic hope of payment in place (*id.* at 24).

As an initial matter, the Court disagrees with Appellants' characterization that the bankruptcy court "shrugged off" their policy arguments.  Instead, the bankruptcy court addressed the policy arguments and related cases they raised directly and in some detail.  *In re Suazo*, 642 B.R. at 869–70.  It is true that the bankruptcy court stated that it "cannot legislate and cannot just make up a new policy framework for Chapter 7 debtor's counsel fees," because "changes to the Bankruptcy Code must be passed by Congress."  *Id.* at 869.  Accordingly, the bankruptcy court concluded that "policy arguments have no real role."  *Id.*  In reaching its decision, the bankruptcy court underscored that in its order, the court did not decide that "all bifurcated fee agreements are *per se* barred."  *Id.* at 870.

Moreover, the bankruptcy court explained that

> [t]he Court is not called upon to decide whether bifurcated
> fee agreements are per se prohibited in every case and
> makes no such determination.  And, the Court will not
> endorse a new framework for what types of bifurcated fee
> agreements might be good policy.  That would seem best left
> to the Legislative Branch.  Instead, the Court must only
> decide the controversy presented: whether the specific Pre-
> Petition Agreement and Post-Petition Agreement violate the
> Bankruptcy Code and the Local Rules.  They do.

*Id.* at 870.

The undersigned agrees.  The bankruptcy court considered whether policy

arguments played an appropriate role in this case and concluded they did not.  By

"center[ing] its decision on the misrepresentations and misleading nature of the Pre-

Filing Agreement and Post-Filing Agreement," the bankruptcy court correctly concluded

that they "negate[] informed consent."  *Id.*  The Court fully agrees with the bankruptcy

court that implementing and achieving improved policy outcomes is a task for Congress,

not these proceedings.  As such, the Court affirms the bankruptcy court's findings and

conclusions concerning the role of Appellants' policy arguments in this case and

similarly finds those arguments without merit here.

## D.  Unbundling

Finally on appeal Appellants claim that "[a]lthough bifurcation divides the work in

a Chapter 7 case between pre- and post-petition, this is not an effort to limit the scope

of the engagement, but instead to facilitate a plenary representation."  (ECF No. 10 at

26.)  They argue that this makes bifurcation and "so-called 'unbundling' rules entirely

complementary," and urge the Court to "resolve any doubt about whether the Local Rule

prohibits bifurcation against there being any conflict between the two."  (*Id.*)

With respect to unbundling services, the bankruptcy court observed that the Pre-

Filing Agreement "purports to create an extremely narrow set of unbundled Pre-Filing Services." *In re Suazo*, 642 B.R. at 863. Schultz committed only to "prepar[e] and fil[e] your Chapter 7 Voluntary Petition, Statement about Social Security Numbers, Pre-Filing Credit Counseling Certificate and List of Creditors to start your Chapter 7 case." *Id.* The bankruptcy court further explained that through the "File Now Pay Later" option, Ovation and Schultz "reconfirm the very limited nature of the services provided per the Pre- Filing Agreement: 'Under this Pre-Filing Agreement, we will **only provide the Pre-Filing Services listed above**.'" *Id.* (emphasis in original). Ovation and Schultz advised Suazo that "**The Pre-Filing Services are not all of the tasks that must be completed to successfully complete your Chapter 7 case**." *Id.* (emphasis in original).

Therefore, the bankruptcy court noted that "the structure of the Pre-Filing Agreement contemplates only an admittedly deficient 'bare-bones' or 'skeletal' submission containing the minimum necessary to start a bankruptcy case." *Id.* Crucial here, the bankruptcy court found that the "Pre-Filing Agreement is misleading because it omits explanation of all the numerous additional filings which are required to be made pursuant to Section 521(a)(1)(B) and Fed. R. Bankr. P. 1007(b) and (c) within 14 days after the Petition Date[.]" *Id.*

Appellants' arguments on this point seem tantamount to a request for an advisory opinion, which the Court will not issue. The role of this Court is to determine whether Appellants' bifurcated fee arrangement with Suazo is misleading so as to contravene of the Bankruptcy Code and Local Rules. In that vein, the Court concludes on *de novo* review that the bankruptcy court accurately analyzed the Pre-Filing and Post-Filing Agreements presented to Suazo. The bankruptcy court concisely—and in this Court's

view, correctly—addressed the reasons for which the unbundled agreements at issue in this case are "problematic":

> [I]n the Pre-Petition Agreement in this bankruptcy case, Ovation and Mr. Shultz were "contractually limiting services to a discrete task, such as filing the bankruptcy petition [*i.e.*, a "bare-bones" filing]." They made it abundantly clear in the Pre-Petition Agreement which states: "Under this Pre-Filing Agreement, **we will only provide the Pre-Filing Services listed above**." (Emphasis in original.) And, the Pre-Petition Agreement in this bankruptcy case is not a "contract[ ] to represent the debtor during the entire case . . . ." Quite to the contrary, in the Pre-Petition Agreement, Ovation and Schultz threatened to withdraw unless Ms. Suazo agreed to enter into a new Post-Petition Agreement. So, the Pre-Petition Agreement is a classic, archetypical example of problematic "unbundling."

*In re Suazo*, 642 B.R. at 869–70 (emphasis in original). Therefore, the Court affirms this portion of the bankruptcy court's opinion concerning unbundling.

## E.   Fees Charged

Appellee argues that in the alternative, the Court may affirm the bankruptcy court for the separate and independent ground that the fees charged under the agreements exceeded the reasonable value of the services that Ovation and Mr. Shultz provided under 11 U.S.C. § 329(b).[5]  (ECF No. 11 at 39.)  However, given the Court's findings above, it is unnecessary to decide this issue.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    The judgment of the bankruptcy court is AFFIRMED in its entirety;

2.    The Clerk shall enter judgment in favor of Appellee and against Appellants, and

---

[5] Given its findings under sections 526 and 528, the bankruptcy court declined to reach this legal conclusion.

shall terminate this case; and

3.   Appellee shall have his costs incurred in this Court, if any, upon compliance with

D.C.COLO.LCivR 54.1.


Dated this 13th day of February, 2023.

BY THE COURT:


_____
William J. Martinez
United States District Judge